at all. Appeal number 201931. Attorney Miller, please introduce yourself on the record and proceed. Good afternoon, Your Honor. May it please the Court, Tara Miller on behalf of Appellants. I'd like to reserve four minutes for rebuttal. You may have it. I'd like to start out by responding to a number of questions I think that each of you had for my co-counsel, Mr. Kochel, in the previous argument concerning the timing and some of the efficiency issues. And I want to layer in an additional concern that we have that we put in our brief about timing. And it's not that we're necessarily arguing that proceeding in a different court would be more efficient or faster. Frankly, what we're suggesting is that the issues are three court had no discretion whether or not to lift the stay. If we had demonstrated a lack of equity and that the property wasn't necessary for an effective reorganization, that this court should opine on the merits. And that's important because what we fear is happening and frankly, what the oversight boards filing late last night demonstrated in connection with that discovery order that Judge Swain issued is that what they're playing is for delay here, actually not faster resolution in the sense that by taking it down, by convincing this court not to address the property and lien issues and instead defer to the summary judgment determination below, they're going to run out the clock on our ability to ever have this court consider whether we have even a colorable claim to a lien or a property interest. And the filing that they put in last night, which we'll submit after the argument, apologies, it was filed right around midnight, is a joint status report. But in their section, they propose supplemental briefing on the summary judgments to be in the summer of 2021, this summer. That's setting themselves up to argue equitable mootness in response to any appeal that we might bring on our lien and property interest issues. And that's not just speculating. That is exactly what they're doing in the Cofina appeal. And so our view is that it's critical that this court at least indicate to the Title 3 court its view of whether there's a different perception of whether the claims that we've asserted based on the statutes and the bond documents are even colorable. And on that, Miller, since they're the ones asking, if you will, that this court not resolve it, and God knows how long it would take to resolve the merits. If they try to assert an equitable argument, aren't you well positioned to say you're stopped from doing that? You put us in this position? So I think we certainly would oppose any argument of equitable mootness. But, you know, the case law is complicated, and we're quite cognizant of the fact that we are but a small slice in the overall Commonwealth restructuring. But you're diligently pursuing your rights everywhere. How could someone possibly assert an equitable mootness claim against you? I think in the bankruptcy context, there is case law, and we would disagree with it and agree with your honors, but there's certainly case law that supports a position that no matter how diligent you were, if you don't stay the effectiveness, once you have substantive consummation of the plan, it's just too complicated, and you can't unscramble it. Think about it. Yeah, I've written a few cases in that area. No doubt you're going to have a transcript of this oral argument, which you can use later. Okay. What's your next argument? I appreciate that. Thank you, Your Honor. You know, so what I'd like to do is just, you know, focus here because I think in some ways, PERFA simplifies the issues where HTA is complicated interplay between a number of agreements. Here, there's a single revenue stream, a single statute, and a single trust agreement that makes it a little easier to get your head around. And, you know, I want to start with, you know, something that I struggled with in trying to understand the Title III court's decision, but it is the fact that the entire decision is driven by its conclusion that the lien and the sinking fund trusts are necessarily coextensive. So this then leads the court to find that Section 401, quote, sets forth the scope of the pledge, despite the fact that unlike in the HTA resolution, Section 401 of the PERFA trust agreement doesn't even discuss the pledge to the bond trustee at all. The court cites no authority for its conclusion, and the oversight board tellingly doesn't seem to be endorsing that on this appeal. And logically, for a lot of the reasons that Mr. Cottrell discussed, there's no reason why the sinking fund or the lien should or even would become extensive. So the Enabling Act here also makes clear that they don't have to be. Section 1907A of the Enabling Act provides that the pledged revenues would be subject to the lien, quote, without the need of physical delivery thereof. Five minutes remaining. Before it gets sent to the bond trustee. So plainly the lien could extend to such monies, and I want to just walk quickly through why it does here. So unlike in HTA, page nine of the trust agreement here unequivocally pledges the pledged revenues. So the whole debate about the scope of the lien here turns on the definition of what pledged revenues is. And so I just want to start there. Pledged revenues are defined inserting the definition of special tax revenues as the offshore excise taxes deposited to the credit of the infrastructure fund pursuant to the act and any other monies that have been deposited to the credit of the sinking fund. So as your honor, Judge Lopez pointed out in the last argument, there is similarly a lot of debate about the last antecedent versus series qualifier rule. And I'm going to rest on the briefs for all of the grammar portions of that argument and focus instead on whether there is a plain indication that the last antecedent rule doesn't apply, which is what this court held is the standard in U.S. v. Venfuel. And I want to submit just four facts that evidence the opposite. One, as you noted, the definition of pledged revenues clearly addresses two distinct pools of money held in two distinct funds. And this structure of the definition of pledged revenues tracks precisely the structure of the monies allocated to PREFA in Section 1914 of the Enabling Act itself. There's no reason why they would have been conflated in the trust agreement. And these two distinct pools of money are precisely what gives the bond trustee its security, which is the stated purpose of the pledge in the Enabling Act itself. If the lien were only on the trust account, meaning monies that PREFA happened to choose to deposit for payment in that year, the trustee would have no security in the event of default. It would be left with only a breach of contract claim. And as the Oversight Board actually cited the Security Industrial Bank for this proposition, the Supreme Court has clearly recognized that there is a difference between a breach of contract claim and the security lien that the secured creditor has. This is essentially giving us an umbrella that we can only use on sunny days. Well, it's not much security in stormy weather. And the bond resolution, which is actually part of the contract, reinforces this construction by specifically authorizing the PREFA director to take all necessary actions to implement and perfect the pledge of the special tax revenues. Could have said the pledge of money in the sinking fund, but it doesn't. It just says the special tax revenues, which is the first hundred and seventeen million of excise taxes. And then it also avoids the super fluidity point, which we went over in the brief. The Oversight Board and the court in rejecting this focus almost entirely on Section 401 in particular, arguing that it somehow prohibits PREFA from granting any liens at all ever in the infrastructure fund. But Section 401 doesn't do that. Section 401 details the mechanics of various funds and accounts. It reads to me almost like the Ten Commandments of the New World Order. Monies shall be held in trust. PREFA shall maintain. PREFA shall not pledge. PREFA shall withdraw. And each directive, whether affirmative or negative, is prospective. These are the obligations that will have to be complied with once the trust agreement goes into effect. And this aligns with Section 501, which the Oversight Board agrees is also only prospective. And the interesting thing there is that in explaining 501 and why it's prospective, the Oversight Board falls into this same coextensive trust and lien problem that I think led the Title III court astray. Because they say, well, of course, it talks about the fact that you have a lien in 501. So obviously it's accepting that lien. That's not what 501 says. 501 says the monies are in trust and no lien shall be granted on any of those monies. Plainly, there can exist in the world a trust without a lien. So, you know, 501, when it says you can't grant a lien to any creditor, would also exclude us, despite the fact that it's held in trust. Time has expired. Thank you, Ms. Miller. Attorney Miller, at this time, if you could mute your audio and video. And Attorney Bienenstock, if you could unmute and introduce yourself on the record. You have a 10 minute argument. Thank you. May it please the court. My name is Martin Bienenstock of Crossgower Rose, LLP. We're attorneys for the Oversight Board today as it as the Title III representative of the Commonwealth. While I have several points, I hope to have time to make. I want to respond to points that have risen in the in the arguments so far because they're obviously important to the panel and the litigants. First. Section 362 D of the Bankruptcy Code does not provide that if the moving party proves certain things, the stay must be lifted. What it provides is relief can be granted, quote, such as by terminating, annulling, modifying or conditioning the stay. And what has happened here in substance is that Judge Swain determined that since she is in the process of resolving the adversary proceeding, which first and foremost determines whether appellants here have any type of security interest or property interest entitled to adequate protection, et cetera, that that will go forward. They have everything they want other than a different judge. They want to start in a different court. And as for the filing last night that Ms. Miller referred to, that filing by Ms. Miller's clients was to extend discovery so that there could be no answer in the adversary proceeding for double the time that the Oversight Board requested, double the time. They're the ones who are asking for delay. The discovery that Judge Swain granted was at their request. That's asking for delay. And the notion that Judge Swain's current adversary proceeding is in its infancy is a complete misstatement. As for the summary judgment, there are summary judgment papers already fully briefed, already ready for argument. The only reason why there hasn't been argument is that they asked for 50-60 discovery and Judge Swain granted some discovery. As soon as that's finished, Judge Swain gets to have oral argument and then decide the summary judgment motions. As for the colorable claim. The nature of their security interests, the basis for it, whether it is contractual, whether it's trust, whether it's based on a trust, whether it's statutory, that those issues will not be addressed by the bankruptcy court. That doesn't sound right to me. It seems to me the very issues that we are being asked to address, the Title III court will have to consider in deciding the claims before it. I wonder if you could please address that. Yes, Judge Lopez, it doesn't sound right because it's 100% totally false. Let me tell you what the adversary proceeding is. Appellants here filed their proofs of claim as they had to because there's a time bar. If you don't file your claim, you don't get to participate. They filed every type of claim one can imagine, secured claims, unsecured claims, trust claims, constitutional claims, statutory lien claims, you name it, they filed it. Then in this state proceeding, they said, well, look at the Grilla decision. Judge Swain cannot, within the context of state litigation, make final rulings on their property interests. So we, the oversight board, said, okay, while we don't think the First Circuit probably had this type of state proceeding in mind where there's been a year of discovery and briefing, but nevertheless, it says what it says. To provide Judge Swain the right vehicle, we will file a complaint starting an adversary proceeding where the complaint is really an answer. What the complaint does is it responds and objects to each and every claim that appellants put in their proofs of claim. So Judge Swain, by definition, will be resolving every type of conceivable property interest, unsecured claims, secured claim, constitutional claim that they have lobbed. And the notion that they haven't yet filed their counterclaims, well, they'll probably time barred because they have to file all their claims already, and we've now objected to their claims. So there will be total resolution of all their claims. And if there is a claim that's not time barred, I'm sure Judge Swain will let them file it if they left out something from their proofs of claim. Five minutes remaining. Five minutes. This is not one of those things as they've postured it as, oh, anyone can make a colorable claim. No, they can't. You have to show a reasonable likelihood of success. And Your Honor, while I appreciate that they wrote good briefs, hopefully we wrote good briefs. You can on a big picture say, well, I'm not sure how this comes out. I'm going to submit how we think it's really easy how this must come out. Section 401 of the trust agreement provides, quote, shall not pledge or create any liens upon any monies in the Puerto Rico infrastructure fund. End of quote. The money here goes from the United States government to the Commonwealth and Section 1914 of the Enabling Act says the Commonwealth shall promptly transfer it to the infrastructure fund. In order for appellants to prevail, this court has to decide that Section 401 does not mean what it says, that they can have a lien on the monies before PRIFA takes it out of the infrastructure fund and places it in the sinking fund. Now, they realize they have no case. So what they're asking Your Honors to believe is that the short, declarative, clear statement in Section 401 shall not pledge or create any liens upon any monies in the infrastructure fund does not mean what it says. They say, oh, it's only referring to a new bond issue tomorrow. You can't do that. And, well, there's no basis in the record for that. So then they say, well, look at Section 501. That says that creditors can have no liens on money in the sinking fund. Clearly, that must be future looking because those liens to the liens that they're counting on. Totally, completely false. The reason it's false is creditors have no liens in this case. The lien was granted to Citibank as the indenture trustee. What 501 is saying is that individual creditors cannot get liens. And the proof of that is, first, it says no creditors can get liens. And second, the all of Section, the trust agreement has a whole section on how creditors are not allowed to sue. At most, they can only instruct the trustee as to what it should do in a lawsuit. So 501 doesn't bail them out of the clear language in 401. And as the late Justice Scalia wrote in Section 17 of his book on reading law, he said, when there's a textual indication to the contrary, that trumps all canons. So we've explained in our briefs how we think the series qualifier canon, which this circuit used in other cases, plainly applies and the last antecedent doesn't. And if you simply look at the language in the Barnard case that used the last antecedent language, that language is nothing like the language, the simple definition. I don't know if you're saying in the first case we should not issue any merits-based ruling. We should simply say it's before the Title III case. But it sounds to me like in this case, you are pressing to get a merits ruling as to whether 401 means they have no colorable claim. I was also struck by your colleagues' comments that we should think of this as being a little bit like a preliminary injunction. It does not foreclose in the end what the district court in a permanent injunction might decide, especially when there are more facts. I suppose they will say, oh, we got the problem of the law of the case. She's now said they're not colorable and she's not going to rethink that. So it's a bit unclear to me what you want us to do. Could you get your priorities and line them up for us? Yes, Your Honor, and thank you for putting it that way, because our priorities and what we think the court can do as a legal matter are, well, they dovetail, but they're slightly different. But here's the answer to Your Honor's question. We think as a matter of law and as our priority, the court should simply determine that Judge Swain did not abuse her discretion because of what she wrote that allowing movements to start over in another forum would be against judicial economy, expeditious resolution, would interfere with this case, etc. Time has expired. Oh, OK. Yes, you may. And then I have another question. OK, thank you, Your Honor. So we and appellants have not even challenged the Sonax factors that now they have falsely said that we are afraid of the merits. So the answer to Your Honor's question is we're tickled pink if you want to handle the merits because we're confident we're right for the reason I mentioned. But our legal point was you don't have to get there because the discretion was so clearly correct. What do you say in response to their, although you may have covered this in your opening, that the shall argument means that there really isn't any discretion and that the statute more or less leaves the timing of this to the filing of a motion. And once it's filed, the district court shall determine the issue. OK, Your Honor, Your Honor was correct. The the shall language is shall grant relief from the stay, quote, such as by terminating, annulling, modifying or conditioning. And that's why I said that the court has effectively done that because everyone wants to get to the bottom of their claims. We need to know that to confirm a plan. So which what is this conditioning? Which phrase are you relying on? Modifying or conditioning, what I'm saying is what the judge is saying is I am. She's effectively modified the state to say your proofs of claim of secured, unsecured, whatever, are now being prosecuted in the adversary proceeding. Since it's already in the title three court, maybe they didn't need stay relief, but in any event, she's saying I'm letting you go forward to prosecute your secured and unsecured claims and that's your relief. And I'd also like to correct that if they have a property interest, that doesn't mean they get relief. That means the court then looks to see whether we've offered adequate protection. And in AMVAC's own pleading at paragraph 92, it says we've stacked up $292 million or we've stacked up $2.9 billion. Well, that's many times the debt service that PREFA and HTAO together. So there's really no risk here. They're more than adequately protected if it ever comes to that. But if they don't have a property interest, then they're not entitled to adequate protection. Counsel, you're not, I must have misunderstood. You're not saying that because she says you are now permitted to pursue your claims in the title three court that I, in effect, I have modified the state to that extent? Is that what you were arguing? No, no. What I'm saying, Your Honor, is when you file a proof of claim, none of us believe you need stay relief to have it prosecuted. And frankly, this is our objection to their claim. So if there was a stay involved, we've waived it by objecting to their claim. But what I'm saying is she has effectively said, I'm doing everything you want to do. I'm proceeding to let you prosecute your proof of claim and prove you have one of these various property interests. And that's the stay relief I'm giving you. You may not have technically needed stay relief because it was in the title three court to begin with. But I am doing what you're asking, what you want to do, only not letting you go to a different court to do it. Okay. Okay. I thought stay relief was being allowed to pursue claims in other forums, either where you've already initiated claims that you wish to. That's a reading that I'm just not familiar with. Well, there's no rule that says that the modification or conditioning of the stay has to mean involvement of another forum. Okay. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you, Attorney Beidenstock. You should mute your device at this time. I believe Attorney McKean is going to be, is going to argue for two minutes. And please introduce yourself on the record. I just want to clarify, I believe I have three minutes of time. Whatever we said before, you have three minutes. Go ahead. Thank you very much, Your Honor. Good afternoon. May it please the court, Elizabeth McKean of O'Melveny and Myers for a FOF. As a threshold matter, I want to say that a FOF agrees with the arguments just made by Mr. Beidenstock. But if the court reaches the merits, it's clear that the Commonwealth did not transfer an ownership interest or create a trust with respect to the RUM taxes. That's important because the resolutions Ms. Miller discussed don't define the bondholder's rights vis-a-vis the Commonwealth. Only the statutes do that. And those statutes don't create a trust. It's not enough to use words like special deposit or for the benefit of to create a trust. When the Commonwealth creates a trust, it uses explicit language. When it created the Puerto Rico Children's Trust, it said, quote, a public trust fund is hereby created. And it went on to say, GDB shall maintain said fund as a fiduciary. Similarly, when the Commonwealth created the Special Communities Perpetual Trust, it created that by statute as, quote, an irrevocable and permanent public trust. And the statute goes on to provide trust funds shall be deposited and kept in GDB separately and independent from the other funds in the custody of the bank. While statutory language might not have to be that unequivocal, Section 1914's directive that Treasury should, quote, cover over certain monies into the infrastructure fund falls far short. We see that within the PREFA Enabling Act itself because Section 1914A specifies that the infrastructure development fund is a special, irrevocable and permanent public trust fund. That's very different than the language regarding the infrastructure fund. Similarly, Section 1923 of the Enabling Act talks about how the infrastructure financing authority special economic assistance fund is, quote, a special fund which shall be a fund to be held in trust. So despite their arguments about the infrastructure fund being held in trust, the fact is that the language simply doesn't get the model lines where they wish they were. And with respect to the point that's come up today about market expectations, the reality is that if the Commonwealth had transferred ownership of or placed in trust the first $117 million of its annual RUM tax receipts, one would expect that the offering statements would have emphasized this as a selling point for bonds, but they didn't. Under the heading security for the bonds, which is in the joint appendix at page 250, the offering statements make clear that the only security for the bonds are the monies deposited in the sinking fund. And so for that reason, unless the court has any questions, I would simply conclude by saying that PREFA couldn't have given more than it got from the Commonwealth. Thank you. Thank you. Thank you at this time. Attorney McKean, please mute your device. And Attorney Depin, if you could please unmute and your argument time. Good afternoon, judges. Again, I'll be very brief. In my argument, again, I'm Luke Depin for the Official Committee of Unsecured Creditors. My argument dovetails into where Mr. Bienenstock left off, which is Section 401. The last paragraph of Section 401, which is in the joint appendix at page 57, talks about the fact that money can be taken out of the infrastructure fund to do certain things. And you might say, why is he raising this with us? Because the sole or the crux of the argument of the appellants is that they have a property interest in the infrastructure fund. And that language at the end of Section 401 is completely inconsistent with them having a property interest because it provides that money can be taken out of that infrastructure fund for other purposes. For example, paying the debt service components. These are non-bonds indebtedness that can be issued by the authority. And it says may be withdrawn on a pro rata basis, meaning that it's the bonds and the debt service components. And the next sentence says, notwithstanding the foregoing order of priorities, the authority shall withdraw monies from the Puerto Rico infrastructure fund to make payments necessary to satisfy the current arbitrage rebate requirements under the code. But the point of that is that they are allowed to take money out of that infrastructure fund, and that for other purposes, non-bond related, and that is inconsistent with the concept that they have a property interest, a sole property interest in that infrastructure fund. And that's the only point we wanted to make, judges. Thank you. Thank you. Thank you, Mr. Penn. If you could mute your device at this time, Attorney Miller, you have a four minute rebuttal. Thank you again, Attorney Miller on behalf of appellants. I'd like to make clear procedurally, because I think this came out in some of the questions, what the oversight board is asking this court to do. They're not asking to affirm because Judge Swain found that it would be more efficient, even if we had a property interest, to defer the issues. They're asking to affirm on alternative grounds that were never reached. What happened below, the Title III court unequivocally denied, and I want to read. You don't need to do that. We're quite familiar with the orders. In the first order, she did not use this notion that there were other proceedings. In the second order, she did. You've made that point in the reply briefs. On the other hand, you didn't go on to say that the reasoning in the second order does not also apply to all of the funds at issue and the question of whether there are property interests. Unless you're making a point I'm missing, can we move on? Sure. The only point that I think isn't clear is that if she were to apply that reasoning in light of a finding of a colorable claim on a property interest, the delay would have to be accompanied by a 362E finding of compelling circumstances, which is what she found in CCDA, where she found that the lien did extend to the accounts that the monies were held in. Ms. Miller, it strikes me that both you and prior counsel are rolling the dice here, as is FOMB. If you really want us to reach the merits, you may regret the result that you get, because a ruling on our part is binding on the district court, whereas the district court's preliminary assessment leaves it open to rethink these matters. Understood. Although I will say that in the briefing on the limited summary judgment motions below, both of the parties stood essentially on their lift stay briefings and said, we're preserving this for appeal, but it wasn't modified or argued. I think there's a recognition that once you find no colorable claim, this is not like a preliminary injunction standard. You see, I don't know. I have been wondering, not having been a bankruptcy practitioner, what the longer term effect is. Mr. Bienstock has just said, this is about you trying to get the case away from Judge Moore and get it into a different forum. That doesn't strike me as being what the lift stay provisions in the statute were meant to accomplish. Well, Justice Ginsburg, in the decision from last year in Brixton, actually said that the resolution of the motion for relief in the state can have many practical consequences. Disposition of the motion determines whether a creditor can isolate its claims from those of other creditors and go it alone. That's right. And FOMB has been saying, let's not get into those consequences at this point in the proceeding. And our position is, as the Supreme Court held, that those are meaningful and important protections for creditors necessitated by the Fifth Amendment. Time has expired. And we're entitled to have them. Okay. Are there any further questions from the panel? No. No. Thank you. I will say on behalf of myself and I hope my colleagues, this has been extremely well argued by all parties. We appreciate it. Thank you. Agreed. Agreed. Thank you, Counsel. That concludes the arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may now disconnect from the meeting.